**Royal W. SIMS and the R. W. Sims Trust, Plaintiffs-Appellees,**

v.

**WESTERN STEEL COMPANY, Defendant-Appellant.**

**Nos. 75–1849 and 76–1703.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Jan. 27, 1977.

Decided March 25, 1977.

John A. Young, Fort Wayne, Ind. (Robert D. Maack, Watkiss & Campbell, Salt Lake City, Utah, on the brief), for plaintiffs-appellees.

George M. McMillan, McMillan & Browning, Salt Lake City, Utah (Ted Boyer, McMillan & Browning, Salt Lake City, Utah, on the brief), for defendant-appellant.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

Defendant-appellant seeks reversal of judgments entered by the United States

District Court for the District of Utah on September 23, 1975, and on May 28, 1976. In the first of these partial summary judgment was entered growing out of the alleged breach of license agreement executed in 1968 by plaintiff-appellee, Sims, and defendant-appellant, Western Steel Company. The provision of the license agreement which the court held was violated and which was the basis for damages provided:

> All engineering drawings, plans, designs and specifications concerning the forward discharge transit concrete mixers within the concept of patent rights of Licensor under this patent shall be, upon termination of the license as provided herein, returned to Licensor at the date of termination.

The court found that there was not only a failure to return some plans and drawings, but that defendant had also made these available to a patent infringer, Rite-Way, Inc. of Indiana. On this account judgment was entered against Western in the amount of $191,426 for compensatory damages, $150,000 for conversion of trade secrets, $100,000 for punitive damages and costs and attorney's fees.*

Western's evidence disputes that any Sims drawings were delivered to it. Thus, Western claims there were none to be returned. It claims to have developed its own drawing and design information in the course of manufacturing, assembling and fitting the component parts. Western's position is that the drawings which it made were plans translating the patent concept into a workable vehicle and that it committed no wrong in sending these to Rite-Way of Indiana.

The other case grew out of Western's alleged inducement of Rite-Way to infringe U.S. Patent No. 2,859,949 covering a concrete mixer truck (forward discharging vehicle), in which Sims and the Sims Trust claimed ownership. It was found and determined at trial that Western had induced the Rite-Way of Indiana infringement and that this grew out of the same delivery of drawings. The court further held that Western was responsible for all of the lost profits of Sims measured by the total reserved royalties of Rite-Way, Inc. of Indiana, which sum was $491,000. The court went on to hold that on a finding of bad faith on the part of the party infringing (or inducing), the damages can be trebled. It proceeded to treble $491,000. It awarded attorney's fees in addition.

Sims had demanded from Western $491,000. This was the exact sum which represented the total royalty obligation of Rite-Way of Indiana. A large part of this was paid to Sims by Rite-Way as a result of a settlement agreement. The $491,000 alleged loss of profits to Sims was attributable to failure of Rite-Way of Indiana to pay royalties over a long period of time. These were transactions with which Western had no connection whatsoever. Western at best was connected with but one transaction, the furnishing of some shop drawings to Rite-Way of Indiana.[1] On its face, then, the gross disproportionateness of the award is apparent.

The mentioned settlement concluded between Sims and Rite-Way of Indiana pro-

---

* The trial court found that Western had sold the shop drawings to Rite-Way for $109.31. This was a faulty premise. The record shows that these drawings were not sold for $109.31 or any other sum. Instead, Western charged Rite-Way $109.31 for reproducing 231 of Western's drawings ($.46 per print). Even, however, if there had been a sale it would be impossible to conceive of this giving rise to the imposition of a two million dollar plus judgment against Western, particularly since there is no showing that Rite-Way made any significant use of the drawings; that Sims suffered any loss as a result of the delivery; that these were in truth trade secrets; or that they had property value of any sort.

1. The only sales of Rite-Way, Inc. which could possibly have been attributed to conduct of Western were those involving so-called three-axle vehicles. The maximum number of these manufactured by Rite-Way, Inc. after delivery of the drawings was twelve. The remaining vehicles for which Rite-Way owed royalties, four and five-axle vehicles, were manufactured before and after 1971. The maximum amount of royalties attributable to Western, if it were shown to have been responsible, would have been $18,000 ($1,500 per three-axle vehicle).

vided for Sims to receive $360,000 in full settlement of all claims for royalties (which amounted to $491,000) against Rite-Way of Indiana. All lawsuits between them were thereby settled and all differences were resolved. This was participated in by Moran Tank Company which was also responsible for the debts of Rite-Way, Inc. of Indiana. A judgment evidencing this settlement was entered on February 4, 1974, by the same district court in another action which was on file between Sims and Rite-Way of Indiana (and Moran).

· One of the arguments advanced by Western is that this unconditional release of Rite-Way, Inc. of Indiana precludes *any* recovery against Western. The theory is that the release followed by a complete settlement evidenced by the entry of judgment for the full amount determined owing from Rite-Way, the direct infringer, operates in law to close the door to any supplemental recovery for the same acts from Western on the alleged theory of inducement of infringement.

It is important to identify Rite-Way, Inc. of Indiana and other participants. In these complex dealings Sims gave a license to Rite-Way, Inc., of Indiana, commencing in 1967, to manufacture four and five-axle concrete mixer trucks. This arrangement continued to 1971. On February 28, 1972, but retroactively effective June 12, 1971, Sims entered into a written contract with Beta Corporation, which is not here joined, whereby the latter acquired from Sims all the rights to the patent. Beta had entered into a license agreement with Rite-Way, Inc. of Indiana, effective July 1, 1971, giving that corporation the limited right to manufacture three, four and five-axle models of the patented invention. This agreement also authorized Rite-Way of Indiana to manufacture replacement parts for forward discharge concrete mixer vehicles which had been previously manufactured and sold. By its terms it ended August 31, 1971, although Rite-Way of Indiana continued to manufacture vehicles and to maintain a royalty reserve.

Beginning in 1970, Rite-Way, Inc. of Indiana went through Chapter X of the Bankruptcy Act. Later, Moran Tank Company, Inc. took over Rite-Way, and from the accounts available, Moran also went into bankruptcy in 1974. During the period of the Moran custody a settlement between Rite-Way of Indiana (and Moran) and Sims occurred.

In the period following the 1968 agreement between Sims and Western, Western had a number of conferences with Rite-Way of Indiana dealing with a possible merger of the two companies. One such conference was in August 1969, at which time one Limbaugh, a purchasing agent of Rite-Way and later General Manager, visited the Western Steel Company facilities in Utah and took back with him customer lists and lists of assets of Western. A dispute exists as to whether Western furnished servicing and manufacturing information contained in two trial exhibits at this time. Western denies that it did so, and there is no evidence in the record that they gave anything except customer lists, vendor lists and some parts descriptions.

Two Rite-Way of Indiana employees, Bowen and Borden, testified during the trials. Bowen said that the drawings were invaluable to Rite-Way of Indiana and that the company profited by having them.[2] As to the customer and vendor lists that Judge Ritter referred to in his findings as being a source of damages, Bowen merely said that he assumed they were used because he saw Limbaugh's trip report referring to them in the company files. He also stated that Rite-Way of Indiana got in the three-axle mixer business after receiving the drawings in 1971. He, however, was not with Rite-Way at the time that the report was written in 1969, nor was he with them afterwards until 1972. Bowen died before the trial on the inducement of patent infringement issues. Borden, who was also general manager of Rite-Way of Indiana, testified at that trial. He said that when he left Rite-Way in 1970, the company did not have the technical know-how provided by the

---

2. This characterization was the only evidence that the drawings were of any value.

detailed drawings. On specific questioning by Judge Ritter he said that he did not have personal knowledge about the circulation of the drawings around the manufacturing plant.

Western's division manager testified that the only reason he sent the drawings to Rite-Way of Indiana was because it (Western) was phasing out the manufacture of the vehicles and wished to have someone manufacture replacement parts for the 100 or more vehicles which it had manufactured and sold. Western also had offered testimony of an engineer, one Emke, saying that the detailed drawings could not have been used in the manufacture of the three-axle vehicles produced by Rite-Way of Indiana.

There exists a dispute about the failure of the trial court to receive the deposition of Limbaugh. In that deposition he stated that his company had not used the drawings obtained in 1971 for the purpose of manufacturing new trucks; that they had made their own drawings as they built trucks; and that they had built the initial three-axle trucks prior to receiving the drawings. He stated that some of the drawings were used in the manufacture of one replacement part, the chute. No justification for refusal to take this deposition is apparent since it was relevant and all formal requisites were satisfied.

Another disputed item of evidence is a statement given by Borden, which was attributable to Bowen who had since died, that Rite-Way had acquired all of Western Steel's technical know-how relating to the manufacture of three-axle trucks. The court received this rank hearsay pursuant to Rule 804(b)(5), Fed.Rules of Evid.

## I.

### THE CONTENTIONS OF WESTERN IN CASE NO. 75–1849, THE ACTION FOR BREACH OF THE LICENSE AGREEMENT

Western's contentions are that:

First, the court erred in not dismissing Sims' action because it is not a case arising under federal law; it is merely a suit for breach of contract. It was not appropriate for the court to entertain the action on a pendent jurisdiction basis because the patent action was palpably insufficient in law and fact, and even if there was some semblance of a claim, it would not satisfy the requirements of pendent jurisdiction.

Second, there is no substantial evidence of damages to support the court's conclusions. There is a lack of proof that the delivery of drawings to Rite-Way produced any damage to Sims caused by the alleged breach of license agreement or conversion of trade secrets.

Third, there is no legal basis whatever for awarding punitive damages.

Fourth, the award of attorney's fees was wholly without basis.

## II.

### THE CONTENTIONS OF WESTERN IN CASE NO. 76–1703, THE SUIT FOR INDUCEMENT OF PATENT INFRINGEMENT

Western's contentions here are that:

First, it was error to refuse to hold that the Beta Corporation was an indispensable party under Rule 19(a), since it was shown to have a vital interest in the lawsuit.

Second, the patent was invalid because of the vagueness and indefiniteness of the claims.

Third, there was a lack of evidence that the principal infringer, Rite-Way of Indiana, in fact infringed. Failure to prove this is fatal to the inducement to infringe claim, for this is an essential prerequisite.

Fourth, the evidence was insufficient to establish that there was inducement to infringe by Western.

Fifth, there was lack of evidence that the drawings furnished by Western had anything to do with infringement by Rite-Way.

Sixth, the award of damages in the sum of $491,000, together with trebling, had no support in the record.

We need not discuss in detail all of the issues listed above. We limit our opinion

for the most part to: first, whether the release of Rite-Way, Inc. by Sims without any reservation of right provision as required by Utah law precludes prosecution of an action against Western; second, whether there is jurisdiction to entertain the action for alleged breach of the license agreement; and, third, whether the license agreement covenant to return drawings, etc., was violated.

### III.

But first, since we are concerned with the lack of merit of all these claims, we deem it necessary to comment briefly on those that are not discussed in detail in Parts IV, V and VI.

#### A. *Liability for Breach of License Agreement and for Conversion of Trade Secrets*

The issues of breach of license agreement and conversion of trade secrets are closely intertwined. Although the license agreement question is dealt with in detail in Part VI, it is helpful here to discuss enough of the common facts to show why the court's trade secrets finding was meritless.

The plaintiff's complaint alleges a breach of license agreement. The contested license provision calls for a return to the licensor on termination of the license of all drawings, plans and specifications concerning the forward discharge transit mixers. The court, in addition to finding a breach of the license agreement, found on its initiative that the documents or information delivered by Western to Rite-Way of Indiana contained trade secrets which were forbidden to be so delivered.

■ There is merit in Western's argument that this license agreement did not impose an express prohibition against sending these drawings. Rather, it addressed itself in pinpoint fashion to documents that had been furnished to Western by Sims and were Sims' property. We are told now, and it is not seriously disputed, that the drawings furnished to Rite-Way were prepared by Western in the course of the practical

adapting of the patent to the manufacture of the product. Hence, even if one were to assume the promise not to submit drawings, plans, designs and specifications furnished by Sims, the language of this stipulation would not cover the kinds of drawings or information that were furnished.

Furthermore, it was not as if these items were forwarded to a competitor who was on the outside of transactions with Sims. Rite-Way of Indiana had been involved with this product since 1967 and the drawings were forwarded in 1971. True, there had been some changes. Beta Corporation had purchased the patent rights in the intervening period and had extended a license to Rite-Way of Indiana, but Rite-Way had constructed three-axle vehicles before and during this period, had never ceased to do so, and the only thing that was in controversy was the payment of royalties.

The terms of the Beta—Rite-Way of Indiana license agreement provided that it would expire August 31, 1971 if not extended in writing. Thus, the earliest the license would have expired was August 31, 1971. There is no reason to believe that Western was aware of this.

Since Rite-Way of Indiana had been in the business, it is hard to see how these could have been trade secrets. And because Rite-Way of Indiana had had a license, any trade secrets should have been published thereby. That is what a patent and a license agreement are all about. So it is incongruous to talk about trade secrets in this context. The award for conversion of trade secrets is therefore vacated.

Finally, we are at a loss to explain the award of $100,000 exemplary damages. Since the record reveals nothing to justify a finding that Western acted maliciously, the manifest weight of the evidence is to the contrary.

#### B. *The Issue as to the Merits of the Claim for Relief Based on Inducement of Patent Infringement*

As previously noted, the injury inflicted here could have, in view of the time factor, affected only 12 three-axle vehicles.

Section 271(b) of Title 35 U.S.C., is the applicable section. It provides that: "[w]hoever actively induces infringement of a patent shall be liable as an infringer." There is a dearth of evidence to establish that there was an active inducement present in this case. The extent of Western's activity was the transfer of the drawings.[3] This subsection contemplates that the inducer shall have been an active participant in the line of conduct of which the actual infringer was guilty. Thus he should be in the nature of an accessory before the fact. No such activity was here shown. Furthermore, the cases require that it should have been intentional, and here again, there is a dearth of evidence on this point. To the contrary, there was strong positive evidence that there was no intent whatsoever on the part of Western to induce an infringement. Indeed the undisputed evidence was that its purpose in sending these drawings was to insure that replacement parts for three-axle vehicles would be continued by Rite-Way of Indiana in view of the fact that Western was phasing out its activity in this respect. It is seen from what has been said that the merits of this claim are uncertain and shadowy and likely non-existent.

C. *The Issue of Damages under the Inducement Cause*

The award of $491,000, the same being the measure of all of the royalties which were allegedly owed by Rite-Way of Indiana to Sims or Beta to compensate for the injury flowing from the giving of these drawings, is so disproportionate as to be shocking. It becomes much more than shocking when the $491,000 is trebled and a commensurate attorney's fee is awarded. There is no more rhyme or reason to this than there is in the award of the items discussed above. In our opinion, then, this is a wholly unjustified determination of liability and a grossly improper award of damages.

The measure adopted by the court, that is, the loss of royalties as between Sims and Rite-Way of Indiana, spans a long period of time, many years, and embraces manufacture of four and five-axle vehicles that were not described in the drawings furnished. The maximum that could have been affected by the drawings, assuming that the drawings were improperly furnished, would have been limited to 12 three-axle vehicles and royalties totaling $18,000.

IV.

DID THE RELEASE BY SIMS OF THE CLAIM AGAINST RITE–WAY, INC. OF INDIANA WITHOUT A RESERVATION OF RIGHT TO PROCEED AGAINST WESTERN CONSTITUTE A RELEASE OF WESTERN ALSO?

We have concluded that the settlement agreement did release Western. If the rule which has been adopted recently by the Supreme Court were to govern, the result might be different. In this case the parties included in the settlement agreement a stipulation providing that Utah law would govern the construction of the agreement. Paragraph 12 of the 1974 agreement states: "[t]his instrument shall in all things be governed by the laws of the state of Utah."

The Supreme Court rulings govern cases in which federal law controls the release question. The decisions enunciating the federal rule are *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964), together with *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

*Aro* was a patent infringement case in which Aro Manufacturing Company had furnished material to owners of Ford vehicles for the replacement of patented tops on convertible models. The Supreme Court held that Aro was liable for contributory infringement for supplying replacement fabrics used on vehicles that had been manufactured without a license.

1965 was the dividing line between the sale by Ford of non-licensed vehicles and the sale of licensed vehicles. A settlement

---

3. Any activity relating to the 1969 trip report is insubstantial in this regard.

agreement was reached in that year between Ford and the convertible company. Aro said that the release of Ford and its joint tortfeasors also impliedly released it, but the Supreme Court held that the release was not effective as to Aro; that a release given a direct infringer which showed an intent to save the releasor's rights against a past contributory infringer succeeded in preserving the rights. *See* 377 U.S. at 501, 84 S.Ct. 1526.

Recently, the Supreme Court has been more definitive in setting forth standards for release applicable under federal law. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). The Court discussed and rejected two rules: 1) the common law rule that a release of one joint tort-feasor released all other parties jointly liable regardless of the intent of the parties; and 2) the rule that the release of one coconspirator normally releases all others in the absence of reservation of rights, which rule is codified in the Model Joint Obligations Act, 9B U.L.A. 355.[4]

The third rule outlined and approved in the Supreme Court's opinion in *Zenith* is that the effect of a release upon coconspirators is determined in accordance with the intention of the parties. *See* 401 U.S. at 345, 91 S.Ct. 795. It credits the earlier *Aro* case with having adopted that rule. It also commented that the *Aro* case had refused to give the benefit of a release to the contributory infringer even where there had been no express reservation of the patent holder's rights against contributory infringers.

■ At bar there is not any express reservation of rights in the settlement agreement against Western or any other inducer or contributory infringer. The release contains no reference showing any intention to reserve rights nor is there any mention of Western notwithstanding that Sims was cognizant of Western's presence as was evidenced by his having reserved his rights of action against Western in connection with the sale of the patent to the Beta Corporation.

Since this settlement agreement was not an issue which was preempted by federal law but rather was a common law matter, it was appropriate for the parties to stipulate that Utah law should govern.

As the Supreme Court's opinion noted in *Zenith,* Utah has adopted the Uniform Joint Obligations Act, 2A Utah Code Ann. Sections 15–4–1 to 15–4–7 (1953). The applicable sections are 15–4–3, 15–4–4 and 15–4–5.[5] Section 15–4–1 defines obligor as including persons liable for a tort.

■ An important aspect of this uniform law is to require that there be a reservation of right as to a joint obligor if the person releasing the principal is to retain rights against the joint obligor. Thus, this statute relieves the harshness of the old common law rule. *See Melo v. National Fuse & Powder Co.,* 267 F.Supp. 611, 613 (D.Colo. 1967), in which the court construed the Utah statute in this manner. The *Melo* court ruled that there had been a release of a joint party where there had been no reservation of right. The court referred to Annot., 73 A.L.R.2d 403, 408 (1960), and it referred also to *Greenhalch v. Shell Oil Co.,* 78 F.2d 942 (10 Cir. 1935), a case involving a reservation of right clause. The Tenth Circuit in that case interpreted the Utah stat-

---

**4.** This provides that the release of an obligor including a joint tort-feasor "shall release co-obligors to the full extent of the obligor's original liability . . . unless the amount of that liability is not known to the obligee . . or the obligee expressly reserves his rights against the co-obligors." 401 U.S. 344 n. 11, 91 S.Ct. 809.

**5.** The most important of these is Section 15–4–4 which provides:

Subject to the provisions of section 15–4–3, the obligee's release or discharge of one or more of several obligors, or of one or more of joint or of joint and several obligors, shall not discharge co-obligors against whom the obligee in writing and as part of the same transaction as the release or discharge expressly reserves his rights; and in the absence of such a reservation of rights shall discharge co-obligors only to the extent provided in section 15–4–5.

ute as embodying the reservation of rights rule. It also recognized that the giving of a complete release without reserving a right barred an effort to bring an action against the joint party.[6]

We conclude that the settlement agreement between the Sims interests and Rite-Way of Indiana (and Moran) was a complete and unrestricted release of Rite-Way which contained no reservation of right and which was governed by Utah law, and, therefore, that it effectively released all rights which Sims may have had against Western.[7]

## V.

## WHETHER THERE IS PENDENT JURISDICTION SO AS TO ALLOW THE TRIAL COURT TO HEAR AND DETERMINE THE BREACH OF CONTRACT CLAIM, CONCEDEDLY A STATE ACTION, IN CONJUNCTION WITH THE EXCLUSIVELY FEDERAL INDUCEMENT TO INFRINGE CLAIM

The guiding light on the subject of pendent jurisdiction is the Supreme Court's decision in *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The trial court applied the *United Mine Workers* rule in holding that there was jurisdiction to consider the alleged contract violation. *Sims v. Western Steel Company,* 403 F.Supp. 450 (D.C.1975). This determination was made on summary judgment and without considering the substantiality of the federal claim. *Gibbs* extended somewhat the pendent jurisdiction doctrine as it had been defined in *Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), where the doctrine had been circumscribed by the then existing cause of action concept.

The requirements set forth in *Gibbs* were, first, that the federal claim must have substance sufficient to confer subject matter jurisdiction on the court, and, second, that the state and federal claims must derive from a common nucleus of operative fact.

Finally, the court said that, considered without regard to their federal or state character, the plaintiff's claims had to be such that he would ordinarily be expected to try them all in one judicial proceeding. Then, assuming substantiality of the federal issues, there was power in federal courts to hear the entire matter. *Gibbs* thus enlarged the discretion of the trial court hearing the case to determine that pendent jurisdiction existed or did not exist.

We are hesitant to condemn in the course of the appeal the finding that the so-called federal claim has substantiality. At least it defines a claim which purports to arise under the patent laws of the United States. Thus, we are reluctant to hold that there was a lack of jurisdiction to try the state claim due to the insubstantiality of the federal claim. So we resolve our doubts and conclude that the trial court had power initially to find and determine whether it had jurisdiction over the federal claim, and also to decide whether the two claims had a common nucleus of operative fact.

It is true that the conduct relied on in both claims was the handling of the drawings by Western. The alleged injury caused in the state case is the breach of the license agreement by nonreturn of the drawings, which constitutes a state law contract action. In the federal case it is contended that the delivery of the drawings triggered patent infringement. We cannot say that these two consequences, if they existed, do not share a common nucleus. The breach of contract is an offshoot of the

6. *See also United States v. First Sec. Bank of Utah,* 208 F.2d 424 (10th Cir. 1953), involving the giving of a covenant not to sue. We there held that under Utah law a covenant not to sue with reservation of right did not bar an action against one who stood in the shoes of a joint tort-feasor. The Utah statute was referred to in that case.

The Supreme Court of Utah in *Dawson v. Board of Education,* 118 Utah 452, 222 P.2d 590 (1950), reached a like result.

7. Section 15–4–5 does not affect this case. It deals only with the effect of the obligee's knowledge or lack of knowledge of the released obligor's share of liability in relation to co-obligors.

federal claim and within its ambit. *Cf. Seneca Nursing Home v. Kansas State Bd. of Social Welfare,* 490 F.2d 1324 (10 Cir., 1974), and *see Stevens v. Rock Springs National Bank,* 497 F.2d 307 (10 Cir., 1974).

### VI.

### WHETHER THE LICENSE AGREEMENT COVENANT TO RETURN DRAWINGS, ETC. WAS VIOLATED

On December 20, 1974, the trial court held in its Partial Summary Judgment that the defendant had breached the License Agreement entered into by the parties by failing to return certain plans and drawings to the plaintiff. The relevant provision of the License Agreement found by the trial court to have been breached by the defendant provides in pertinent part that:

> All engineering drawings, plans, designs and specifications covering the Forward Discharge Transit Concrete Mixer within the concept of the Patent Rights of Licensor under this License, shall be upon termination of this License as provided herein, <u>returned</u> to Licensor at the date of termination . . .

(Emphasis added.)

■ The primary question before the trial court on a motion for partial summary judgment was: what is the plain meaning of "returned"? Judge Ritter applied the plain meaning doctrine. The rule under Utah law is that "[i]f the language of a contract is clear and not subject to more than one interpretation, the ordinary plain meaning of the words of the contract must be used." *Petrof Trading Co. v. Intermountain Research and Engineering Co.,* 424 F.2d 704, 706 (10th Cir. 1970). Judge Ritter clearly stated that "[t]he partial summary judgment was made in reliance on the plain meaning of the word ['returned'] absent evidence of any other reasonable construction or intent by the parties at the time the agreement was signed." *Supra,* 403 F.Supp. at 454.

■ Judge Ritter acknowledged that he should apply the plain meaning doctrine to the term "returned," but this he failed to

do. "Return" means that something which has had a prior existence will be brought or sent back. This definition is supported by dictionary definitions and case law. The United States Supreme Court, in an early decision, gave this meaning to return. It stated that " 'return' implies the prior existence of some state or condition." *Clyatt v. United States,* 197 U.S. 207, 219, 25 S.Ct. 429, 431, 49 L.Ed. 726 (1905). A similar definition is set forth in *United States v. Weiss,* 34 F.Supp. 99, 100 (S.D.N.Y.1940), where the court said "the word 'return' . . . indicates that the desired records and recordings were originally the property of the defendants, which is not the fact. It is impossible to return to them something that they have never possessed." Other courts have applied a similar definition. The Colorado Court has stated that "[t]he word 'return' in its common and accepted use means to bring back or restore, and is a recognition of a right, ownership, dominion or control of the article in one who has not the immediate possession thereof." *Johnson v. Hilliard,* 113 Colo. 548, 160 P.2d 386, 389 (1945). It is not surprising that Black's Law Dictionary (4th ed. 1951) defines "return" as "[t]o bring, carry or send back; to place in the custody of; to restore; to redeliver; to send back." The American College Dictionary (1970) defines "return" as ". . . to put, bring, take, give, or send back . . ."

The trial court refused to so interpret the word "return." It said:

> The agreement, it seems to me, isn't open to any construction. It says all of the stuff should be returned. The use of "return" doesn't, it seems to me, limit the documents to those that on some other time were delivered to them. It is whatever you have, however you got them.

Rec. on App., Vol. I, 9 (No. 75–1849). From the legal definitions, there can be a return only if there had been a prior delivery.

There is no evidence whatever that any of the plans or drawings sought in this action had been originally sent by Sims to Western. Melvin J. Glade, in an affidavit

filed in Opposition to Plaintiff's Motion for Summary Judgment, stated that there were no drawings or written design data tendered to Western Steel Company by the plaintiffs. He stated that Western Steel did subsequently develop its own drawings and design information, but did not develop any significant concepts, patentable ideas or other information which would have enhanced the letters patent. Indeed the trial judge did not find that any drawings or plans were given to Western. In the court's opinion and order it was stated that "engineering drawings as referred to in the license agreement exist and were in the possession of the defendant." *Supra*, 403 F.Supp. at 454. When we view this finding in conjunction with his statement at trial, it appears that "return" meant something to the trial judge quite different from redelivery. In short, he did not find that property once in Sims' possession was not returned to Sims.

There is little or no showing that Sims suffered injury or damage as a result of not receiving drawings. True, Sims argues that he was harmed by not receiving the drawings because he planned to use them to make replacement parts from which he expected to make a profit. But this, a mere expression, was given after the fact. It is more significant that he never made a demand for them from Western until the trial. In a letter dated February 14, 1974, from Sims' attorney to Western purporting to be a notice of breach of the settlement agreement, Sims claimed that he was not notified of the availability of engineering drawings, plans, designs and specifications tendered by the licensee to others and that such information came to his attention just recently. If Sims had in fact intended to manufacture replacement parts, and if Western's drawings and plans had been necessary for him to do so, it is certain he would have requested these documents long before 1974. It is equally improbable that Sims lacked knowledge of drawings and plans available since he knew that Western was engaged in manufacturing pursuant to the patent and license. Also, Sims was shown to have worked closely with Western while it was engaged in this work.

The undisputed evidence also establishes that the documents were never put out of reach of Sims because the originals were not sent to Rite-Way of Indiana. Copies were made for the use of Rite-Way of Indiana. Therefore, if Sims had really needed the drawings to build replacement parts, he could have had access to them if he had made a simple request (prior to trial). One gets the impression that this entire claim was the product of afterthought. In the face of this record we find it impossible to give any credence to the adjudication and award. In our view it must be vacated.

The judgments of the district court are reversed and the causes are remanded with instructions to dismiss both the actions.