974 P.2d 1051

Robert Frank CONVERSE,
Plaintiff–Appellee,

v.

John William Pieper JAMES,
Defendant–Appellee,

and

Robert Leroy Reed,
Intervenor/Defendant–Appellant.

No. 16218.

Intermediate Court of Appeals of Hawai'i.

Nov. 28, 1997.

As Amended Jan. 28, 1998.

As Amended April 13, 1999.

Certiorari Denied May 24, 1999.

Richard S. Ekimoto (Dinman, Nakamura, Elisha & Lahne, of counsel), on the briefs, Honolulu, for intervenor/ defendant-appellant.

Carroll S. Taylor (Taylor, Leong & Chee, of counsel) on the brief, Honolulu, for plaintiffs-appellees.

John William Pieper James, defendant-appellee, pro se, on the brief.

BURNS, C.J., WATANABE and ACOBA, JJ.

Opinion of the Court by WATANABE, J.

In this action arising out of an alleged breach of an agreement of sale (AOS) for real property, Intervenor/Defendant–Appellant Robert Leroy Reed (Reed) appeals from the First Circuit Court's (1) May 7, 1992 Order Denying Motion to Amend Findings of Fact, Conclusions of Law and Judgment Filed on October 15, 1991; (2) May 12, 1992 Order Granting Plaintiff's Motion for Award of Attorneys' Fees; and (3) Amended Judgment filed on May 27, 1992.

We reverse.

## BACKGROUND

On December 7, 1977, Plaintiff–Appellee Robert Converse (Converse) entered into a three-year AOS to sell certain real property located in Moanalua Valley, Honolulu (the subject property) for $80,000 to Ted G. Kroum (Kroum) and Defendant–Appellee John James (James), as tenants in common. Pursuant to the AOS, Kroum and James made a $5,000 down payment and were jointly and severally liable for the balance of $75,000 that was due on or before December 9, 1980. Interest on the $75,000 balance at the rate of eight percent per annum was payable in monthly installments of $500.

Paragraph j(2) of the AOS noted that the house on the subject property was "in need of major structural repair," and subsequent to the closing of the AOS, James and Kroum began making extensive repairs to the house. For example, they replaced a slanted wall which had caused the entire house to lean towards the inside of the valley.

On March 8, 1979, Kroum assigned his undivided one-half interest in the AOS to Dwayne McDaniels (McDaniels), who, four days later, assigned his interest to Reed. Consequently, from March 12, 1979, James and Reed owned the subject property as tenants in common and were jointly and severally liable for the $75,000 debt to Converse under the AOS. Reed, a teacher at Kailua High School who taught bidding construction and drafting, had formerly taught apprentice carpentry at Honolulu Community College and for Local 745 of the Carpenters' Union and held a general contractor's license from 1974 to 1988. It was Reed's and James's intention to improve the house and then re-sell the subject property for a profit. Accordingly, the pair took out a construction loan for $40,000 and then proceeded to make substantial improvements to the subject property, including the construction of an addition on the downslope side of the house which included three bedrooms, two baths, and a rooftop lanai.

Reed stated that he completed the improvements to the house in about August 1980, shortly before he was to return to his teaching job. At that time, according to Reed, the house was "in perfect shape[,]" and all monthly payments under the AOS were current. Thereafter, James and Reed offered the subject property for sale, listing it with a real estate brokerage firm for a price of $275,000. At the time of the listing, however, interest rates on real estate loans had

skyrocketed to their highest in history, and no oral or written offers were made for the subject property.

In September of 1980, James, through his attorney, contacted Converse to propose a business venture related to a Don Ho concert (the concert) that James was promoting in Evansville, Indiana. Converse's understanding was that James had run out of funds to proceed with the concert and was seeking a loan from Converse for $25,000. In exchange, Converse would receive twenty percent of the concert profits; additionally, James would put up his one-half interest in the subject property as collateral for the loan.

Although Converse agreed to make the loan, he wanted to be assured that he would get his money back. Consequently, he entered into a Purchase Agreement Option (PAO) with James dated September 15, 1980, agreeing to loan James $25,000 (the loan) and assist in the promotion of the concert. Under the terms of the PAO, if James failed to repay the loan by November 1, 1980, Converse would have the option of waiving James's payment of the $25,000 loan, "together with a $75,000 payment due on [the subject] property on December 9, 1980," in exchange for James's conveyance of his one-half interest in the subject property to Converse.[1] Converse testified that the value of the subject property at the time the PAO was executed was between $200,000 and $230,000. Moreover, an appraisal of the subject property done on November 28, 1980 valued the property at $235,000.

Unfortunately, the concert which James was promoting never got off the ground, and James was unable to repay Converse the

---

1. At trial, two slightly different versions of the Purchase Agreement Option (PAO) were offered into evidence, and there was a great deal of questioning as to which version was the actual PAO entered into between Plaintiff–Appellee Robert Frank Converse (Converse) and Defendant–Appellee John William Pieper James (James).

The body of the PAO, offered into evidence by Converse as Plaintiff's Exhibit 2 and by James as Defendant's Exhibit B, was essentially typed, but it included blank lines in which pertinent dates, Converse's address, the location of the property which James was putting up as collateral for the PAO (the subject property), and the due date of the $25,000 loan were handwritten. According to this version of the PAO, the option which James gave to Converse in the event James failed to pay off the $25,000 loan on time was as follows:

 1. In consideration of GRANTOR being loaned $25,000.00 on or about September 11, 1980 by GRANTEE together with a $75,000.00 payment due on said property on *9 Dec., 1980* from GRANTOR to GRANTEE, being waived by GRANTEE, GRANTOR agrees to grant, bargain, deed over, sell, assign and convey unto GRANTEE all rights and interests in the property described in Exhibit "A".

 2. THIS OPTION SHALL BE VALID AND BINDING ON THE PARTIES HEREIN ONLY IF GRANTOR FAILS TO REPAY THE $25,-000.00 LOAN TO GRANTEE ON OR BEFORE NOVEMBER 1, 1980. If and when GRANTOR repays said $25,000.00 loan to GRANTEE on or before November 1, 1980, this PURCHASE OPTION AGREEMENT shall automatically become null and void and of no legal effect.
(Underscored date handwritten.)

The PAO offered into evidence by Intervenor/Defendant–Appellant Robert Leroy Reed (Reed) as Reed's Exhibit 13 was certified by the Assistant Registrar of the Land Court of the State of Hawai'i as a "true copy from the records of the Bureau of Conveyances of the State of Hawaii [Hawai'i]." The body of this version of the PAO was entirely typewritten, and although its text was almost identical to Plaintiff's Exhibit 2, its paragraph 1 contained a slight variation from paragraph 1 of Plaintiff's Exhibit 2/Defendant's Exhibit B:

 1. In consideration of GRANTOR being loaned $25,000.00 on or about September 11, 1980 by GRANTEE together with a $75,000.00 payment due on said property on December 9, 1980 from GRANTOR to GRANTEE, being waived by GRANTOR, GRANTEE agrees to grant, bargain, deed over, sell, assign and convey unto GRANTEE all rights and interest in the property described in Exhibit "A".
(Underscoring added to highlight differences between two versions.) It appears, therefore, that the version of the PAO that was actually recorded at the Bureau of Conveyances transposed the words "GRANTOR" AND "GRANTEE."

At trial, Converse's lawyer questioned James extensively about which version of the PAO that James had signed as well as James's understanding of the deal reached between James and Converse. James testified that in light of his background as a teacher and real estate agent, he doubted that he would have signed and recorded a PAO which had handwritten interlineations, because it would have been "sloppy" to do so. James believed that it was far more likely that he signed the typewritten version of the PAO, although James admitted, after studying the language of that version, that its paragraph 1 "didn't make sense" and was awkwardly drafted.

$25,000 loan by November 1, 1980. Thereafter, Converse took steps to exercise his option under the PAO. On February 24, 1981, Converse filed in Land Court a document entitled "Exercise of Option." On March 9, 1981, Converse also filed a petition in Land Court, requesting that James's one-half interest in the subject property be transferred back to Converse.

Meanwhile, in November 1980, with the December 9, 1980 maturity date for the AOS around the corner, Reed applied for and received approval to obtain a bank loan to pay off his one-half share of the $75,000 balance payable under the AOS. About the time the AOS balance was due, however, Converse telephoned Reed to explain "what was going on with James, whereby, [James] basically had signed this option agreement and had not paid [Converse]. And so, ... [Converse] was exercising the option agreement[.]" Converse also sent Reed a copy of the PAO. After reading the PAO and learning that the $75,000 due under the AOS had been paid off under the PAO, Reed believed that his own obligation to Converse under the PAO had also been paid off. Because he "didn't see any point in paying the high interest rates at that time to take out a loan just to put money in the bank," Reed canceled his loan application.

After the December 9, 1980 due date for the final AOS payment had passed, Reed continued to collect rent from the tenants living on the subject property, forwarding half of the sum collected each month to Converse. On June 2, 1981, the Land Court granted Converse's petition to enforce the PAO, and James does not dispute that he lost his one-half interest in the subject property at that time. Converse testified that it was his understanding that after he acquired James's one-half interest, he and Reed would jointly complete the improvements to the subject property and then sell the property, with Reed paying off his one-half share of the AOS balance from the proceeds of the sale. According to Converse, however, the day after his Land Court case with James ended:

I called ... Reed and explained to him the outcome of the court case, and I said,

"Well, let's get together and work out an agreement. You know, all you have to do is pay me the other half agreement of sale." We sat down, tried to finish this house and sell it. At that time he said, "I don't owe you anything."

By a December 17, 1981 letter, Converse, through his attorney, notified Reed that Reed was in default under the AOS and demanded that Reed pay the sum of $37,500, plus interest, for his one-half interest under the AOS. Reed refused to make such a payment, explaining his position in a December 21, 1981 letter as follows:

The $75,000 payment of the agreement of sale note, due December 9, 1980 was waived by Mr. Converse on November 24, 1980 by his exercise of a certain Purchase Option agreement with Mr. John James.

Waiver of the $75,000 note plus cancellation of a $25,000 loan resulted in Mr. Converse paying $100,000 for James' [sic] share of the property, which appraised, for mortgage loan purposes by an independent appraiser, at $235,000 on November 28, 1980.

On January 27, 1982, Converse filed a second petition in Land Court, this time seeking an order "terminating and extinguishing" Reed's one-half interest in the AOS and the subject property. At trial, Reed's primary defense was that upon Converse's exercise of the PAO against James, Converse had waived the $75,000 balance owed by James and Reed as joint and several co-obligors under the AOS and therefore, Reed owed nothing to Converse. Reed admitted, however, that he was not a party to the PAO, that he had no knowledge of the PAO until after Converse had exercised the option, and that he was in no way involved in the concert and loan which gave rise to the PAO.

On December 14, 1982, the Land Court found and concluded that Reed owed Converse $37,500 under the AOS, that Reed had paid only $500, that time was of the essence, and that Reed was in default. On January 14, 1983, judgment was entered . canceling Reed's interest in the AOS, allowing Converse to retain the $500 paid as liquidated damages, and transferring title to Reed's

one-half interest in the subject property back to Converse.

James and Reed each appealed from the Land Court orders which divested their interest in the subject property, and their appeals were later consolidated. In *In re Will & Estate of Damon*, 5 Haw.App. 304, 689 P.2d 204 (1984), this court vacated the orders of the Land Court because we were unable to determine from the record whether the PAO was an option agreement or a mortgage. We also remanded the case to the Land Court for entry of appropriate findings of fact and conclusions of law regarding the intent of the parties to the transaction, observing that on remand the Land Court may find

> that the PAO is an option agreement with the purchase price being $100,000 ($25,000 loan to James plus the [AOS] balance of $75,000 being waived by Converse). Such finding may absolve Reed of any liability in [his appeal from the judgment which cancelled his interest in the subject property as a purchaser under the AOS]. If the land court finds that the PAO is a mortgage securing James' [sic] debt of $25,000, then the principal balance due on the AOS remains at $75,000 and will affect Reed's joint and several liability with James under the AOS.

*Id.* at 313–14, 689 P.2d at 210. On remand, however, the Land Court instead granted Reed's motion to dismiss both claims of Converse "for lack of jurisdictions [sic] of the subject matter."

## PROCEDURAL HISTORY

On January 7, 1988, Converse filed the instant lawsuit against James in the Circuit Court of the First Circuit (circuit court), seeking specific performance of the PAO and/or damages. On October 13, 1988, the court entered an "Order Granting Robert Leroy Reed's Motion to Intervene as a Defendant."

It is undisputed that during the course of the litigation regarding the AOS, the subject property fell into "substantial disrepair." At trial, John Steinke (Steinke), a general contractor, testified as an expert witness that the best solution to repairing the subject property would be to demolish the entire house at an estimated cost of $15,000–$20,000 and start again. In 1989, Converse conveyed his interest in the subject property to his wife, Maria Converse, who was subsequently added as a plaintiff to this action.

After a jury-waived trial, the circuit court found in favor of Converse and entered its Findings of Fact (FsOF), Conclusions of Law (CsOL) and Judgment on October 15, 1991. The Judgment canceled the AOS, awarded Converse $6,824.80 as fair rental value for Reed's occupancy of the subject property from December 9, 1980 until late 1982, dismissed Reed's and James's counterclaims, and awarded Converse reasonable attorney fees and costs. An amended Judgment entered on May 27, 1992 awarded attorney fees and costs to Converse for the sum of $29,448.73. This timely appeal by Reed followed.

## ISSUES ON APPEAL

The dispositive issues raised by Reed in this appeal are as follows:

1. Whether the circuit court erred in ruling that the Hawai'i Uniform Joint Obligations Act (HUJOA), Hawai'i Revised Statutes (HRS) chapter 483 (1993), was inapplicable to reduce Reed's obligations to Converse under the AOS.

2. Whether the circuit court erred in canceling the AOS, thereby allowing Converse a double recovery.

3. Whether the circuit court erred in awarding Converse attorney fees and costs.

## STANDARDS OF REVIEW

■ A proceeding for cancellation of an agreement of sale lies in equity, and the relief granted by the trial court is reviewed under the abuse of discretion standard. *PR Pension Fund v. Nakada*, 8 Haw.App. 480, 487, 809 P.2d 1139, 1144, *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1991).

■ A trial court's findings of fact are reviewed under the clearly erroneous standard. *Island Directory Co. v. Iva's Kinimaka Enters.*, 10 Haw.App. 15, 23, 859 P.2d 935, 940 (1993). "A finding of fact is clearly erroneous when (1) the record lacks substan-

tial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (internal quotation marks omitted).

 Conclusions of law are reviewed *de novo* under the right/wrong standard. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992). Where the conclusions of law are derived from the facts and circumstances of the parties' relationship, those facts and circumstances are reviewed under the clearly erroneous standard. *Cho Mark Oriental Food v. K & K Int'l*, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992).

## DISCUSSION

A. *Whether the HUJOA, HRS Chapter 483, Was Applicable to Reduce Reed's Obligation to Converse Under the AOS*

 Reed contends that the circuit court was wrong when it orally ruled that the HUJOA, HRS chapter 483, was "inapplicable" to the instant case. Reed also challenges, as clearly erroneous, the circuit court's FsOF 12, 15, and 16, which state as follows:

> 12. In addition, Reed was neither a party to nor a beneficiary of the [PAO] and the [PAO] did not waive or relieve Reed of his obligation to pay his share of the [AOS] balance upon maturity of the [AOS].

> 15. On December 9, 1980 and thereafter, Reed failed to pay R. Converse $37,500 as required by the [AOS] for his one-half interest in the property.

> 16. The [AOS] has remained unpaid for more than ten years after its maturity.

Reed maintains that when Converse exercised his option under the PAO, Converse released James from liability under the AOS.

Therefore, according to Reed, HRS § 483–3 released Reed from liability under the AOS as well.

Converse argues, on the other hand, that the PAO did not relieve Reed of any obligations under the AOS because (1) Reed was not a party to the PAO, was nowhere mentioned in the PAO, and did not even know about the PAO until Converse notified Reed of James's default thereunder; and (2) a plain reading of the PAO reveals that only James was released from liability under the AOS. Converse also argues that the HUJOA, by its express terms, would not apply to relieve Reed from liability under the AOS.

1. *The Scope and Applicability of the HUJOA*

Under the early common law rule, a release of one of several joint obligors on a contract automatically released all other joint obligors. *Sunbird Aviation, Inc. v. Anderson*, 200 Mont. 438, 651 P.2d 622, 626 (1982); 66 Am.Jur.2d *Release* § 35, at 714 (1973). This rule applied both to co-debtors and joint tortfeasors. H. Havighurst, *The Effect of a Settlement with One Co–Obligor Upon the Obligations of the Others*, 45 Cornell L.Q. 1 (1959). Not surprisingly, this rule was severely criticized over the years for its harsh and unintended consequences, and in some jurisdictions, was modified by statute. 66 Am.Jur.2d *Release* § 36, at 715. Some of these statutes provided that a release shall not release all joint obligors, and others provided that a release should be given effect according to the intention of the parties.

In 1925, concerns about the harshness of the common law rule as well as the lack of uniformity among statutes aimed at ameliorating the harshness of the rule prompted the National Conference of Commissioners on Uniform State Laws and the American Bar Association to approve the Model Joint Obligations Act, which, pursuant to Section 9 of the act, is cited as the Uniform Joint Obligations Act (UJOA) [2] and is the act upon

---

2. The Prefatory Note to the *Model Joint Obligations Act,* which pursuant to Section 9 is cited as the Uniform Joint Obligations Act (UJOA), explains the reasons for adoption of the UJOA as follows:

> It is universally agreed that the common law in regard to joint obligations is likely to work injustice. The effect of it is not fully understood by the parties that enter into such obligations or by those to whom they are bound,

which the HUJOA, now codified in HRS chapter 483, is modeled. *Uniform Law Commissioners' Model Joint Obligations Act,* Historical Note, 13 U.L.A. at 407 (1986).

In relevant part, the HUJOA, provides as follows:

**§ 483–1 Definitions; limitations of law.** In this chapter, unless otherwise expressly stated, obligation does not include a liability in tort; obligor does not include a person liable for a tort; obligee does not include a person having a right based on a tort. Several obligors means obligors severally bound for the same performance.

\* \* \*

**§ 483–3 Crediting of payments made to obligee.** The amount or value of any consideration received by the obligee from one or more of several obligors, or from one or more of joint, or of joint and several obligors, in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety.

**§ 483–4 Effect of obligee's release to one or more.** Subject to section 483–3, the obligee's release or discharge of one or more of several obligors, or of one or more of joint, or of joint and several obligors shall not discharge co-obligors, against whom the obligee in writing and as part of the same transaction as the release or discharge, expressly reserves the obligee's rights; and in the absence of such a reservation of rights shall discharge co-obligors only to the extent provided in section 483–5.

and the results are often very technical. It is with a view to correct these injustices that the present act has been prepared.

In most of the United States, statutes have somewhat changed the common law in regard to joint obligations. These statutes are, however, not uniform in character. They are aimed chiefly against the rule requiring the joinder of all joint debtors, that declaring a joint obligation discharged by either a judgment or release of a joint debtor, and that providing that on the death of a joint obligor his estate is freed from liability to the creditor.

**§ 483–5 Effect of knowledge of obligee in making release.** If an obligee releasing or discharging an obligor without express reservation of rights against a co-obligor, then knows or has reason to know that the obligor released or discharged did not pay so much of the claim as the obligor was bound by the obligor's contract or relation with that co-obligor to pay, the obligee's claim against that co-obligor shall be satisfied to the amount which the obligee knew or had reason to know that the released or discharged obligor was bound to such co-obligor to pay.

If an obligee so releasing or discharging an obligor has not then such knowledge or reason to know, the obligee's claim against the co-obligor shall be satisfied to the extent of the lesser of two amounts, namely (1) the amount of the fractional share of the obligor released or discharged, or (2) the amount that such obligor was bound by the obligor's contract or relation with the co-obligor to pay.

In enacting the HUJOA in 1941, the Hawai'i legislature deviated from the UJOA in only one substantive respect: under the HUJOA, specifically HRS § 483–1, the obligations of joint tortfeasors are specifically exempted from application of the HUJOA.[3] As to all other joint and several obligations, however, the HUJOA applies.

In the instant case, the circuit court specifically made the following finding of fact, which Converse has not appealed:

6. On or about March 12, 1979, James and McDaniels assigned their interest in the property to James and Reed as tenants in common, *both James and Reed being jointly and severally liable for the $75,000 balance due.*

Less often is any change made in the rights of joint obligees; and it will be noticed that a common provision in these statutes that the liability of joint debtors shall be joint and several does not affect the objectionable rule that the release of one discharges all. None of the statutes completely corrects the evils of the common law.

3. In Hawai'i, joint and several obligations involving joint tortfeasors are covered by the Uniform Contribution Among Tortfeasors Act (UCATA), Hawai'i Revised Statutes (HRS) chapter 663.

468

(Emphasis added.) Moreover, this case involves the joint and several debt of James and Reed under the AOS and does not involve joint tortfeasors. Therefore, the HU-JOA is clearly applicable to James and Reed's joint and several obligation to Converse under the AOS. Accordingly, the trial court erred when it ruled to the contrary.

### 2. The Application of the HUJOA to the PAO

Converse maintains that even if the HU-JOA were generally applicable to the joint and several obligation of James and Reed to Converse under the AOS, application of the HUJOA would not relieve Reed of his liability in this case. Converse acknowledges that under the common law, Converse's release of James would have also released Reed from liability. However, Converse claims that the HUJOA "reflects the modern rule 'that a discharge of one joint obligor does not discharge the other.'" Thus, according to Converse, the amount received by Converse from James under the PAO only "operated to release Reed for that portion of the total debt which Reed and James agreed that James would pay[,]" namely $37,500; Reed remained liable under the HUJOA for payment of his one-half share of the balance due under the AOS, $37,500.

For the reasons that follow, we disagree with Converse.

#### a.

We note, first of all, that Converse's position that the PAO only operated to release Reed for James's one-half share of the debt, i.e., $37,500, is belied by the plain and unambiguous language of the PAO and Converse's own testimony at trial.

The PAO clearly provided that what Converse would be waiving, in exercising his option under the PAO, was "a $75,000.00 payment due on said property on December 9, 1980." The $75,000 payment due on December 9, 1980 was the entire balance due from James and Reed under the AOS. Nowhere in the PAO is there any indication that the parties intended that only the payment of James's pro rata share of the $75,000 balance due was being waived.

The record also indicates that Converse knew that the PAO, in express terms, waived James's liability on the entire $75,000 debt not just James's pro rata share. At trial, Converse testified on cross-examination as follows:

Q. Now as far as I understand your position with regard to the purchase agreement option, your position is that you were only waiving thirty-seven thousand five hundred dollars of the agreement of sale; is that right?

A. Yes. As well as—well, yes.

Q. However, the document does say seventy-five thousand dollars, right?

A. Right. I was waiving James' [sic] debt of seventy-five thousand.

Q. So you're only waiving James' [sic] debt of seventy-five thousand, right?

A. Correct.

Q. So after this document was executed, and if James did not repay you the seventy-five thousand dollars when it was due, and you decided to exercise the option that you would get Mr. James' [sic] one-half interest of the property and Mr. James would owe you nothing, right?

A. That's correct.

Q. Would Mr. Reed still owe you some money?

A. Yes.

Q. Would he still owe you the seventy-five thousand?

A. No, he wouldn't owe the seventy-five.

Q. Your position is that Mr. Reed would still owe you the thirty-seven five, right?

A. Correct.

#### b.

■ Second, it is a firmly established principle that

if a debt or judgment is owing by two or more persons jointly, each primarily liable, and one of them pays it, such debt or judgment is, at law, absolutely extinguished, regardless of the intention of the parties, and it is beyond the power of the

creditor and the paying debtor to keep the debt or judgment alive. It is reasoned that the creditor in such a case is entitled to only one satisfaction.

60 Am.Jur.2d *Payment* § 137, at 977–78 (1987). *See also Western Steel Co. v. Travel Batcher Corp.*, 663 P.2d 82, 83–84 (Utah 1983) (holding that "[t]he law is well settled that an obligee is entitled to be paid in full but cannot exact a double recovery"); *Rector, Church Wardens etc. v. New York*, 261 A.D. 614, 26 N.Y.S.2d 762 (1941) (holding that "[s]atisfaction [of a debt] operates to discharge from liability not only the one who makes the payment and in whose favor the release runs but all others jointly or severally liable"). The foregoing principle has not been altered by adoption of the HUJOA, as courts construing similar state versions of the UJOA have concluded.

In *Whittlesea v. Farmer*, 86 Nev. 347, 469 P.2d 57, 59 (1970), for example, the supreme court of Nevada observed:

> The Uniform Joint Obligations Act contemplates a document which extinguishes the plaintiff's claim and does not embrace a covenant not to sue or not to execute, and we so rule. *Since the plaintiff may have but one satisfaction for his injuries from joint tortfeasors, the amount paid for a covenant by one of them reduced by that amount the liability of the others.*

(Emphasis added.) Similarly, in *Grynbal v. Grynbal*, 32 A.D.2d 427, 302 N.Y.S.2d 912 (1969), the Supreme Court of New York held that under General Obligations Law § 15–103, New York's equivalent of UJOA § 3, payments by one joint tortfeasor reduced *pro tanto* the amount of damages recoverable by plaintiff against other joint tortfeasors.

In *Western Steel Co. v. Travel Batcher Corp.*, the Supreme Court of Utah was called upon to determine whether the plaintiff-obligee had been fully compensated for its loss by a co-obligor. The court initially observed that "[t]he law is well settled that an obligee is entitled to be paid in full but cannot exact double recovery." 663 P.2d at 83–84. The court then stated:

> [T]he determination as to whether the plaintiff was fully compensated for its loss, thus barring additional recovery, turns on

whether the release of defendants' counterclaim was intended to be full payment of the deficiency between the amount recovered on the foreclosure sale of the ready mix truck ($19,200) and the total amount owing by defendants. To the extent that the release of claims satisfied the deficiency owing, it should be credited to all defendants, ... as required by U.C.A., 1953, § 15–4–3 which is part of the Uniform Joint Obligation Act adopted by our legislature in 1929.

663 P.2d at 84. Reversing a grant of summary judgment that had been entered in favor of a defendant co-obligor, the Utah court stated that "[i]t is a question of fact for the [trier of fact] whether a performance rendered by one obligor was received as the full equivalent and satisfaction of his claim by the obligee." *Id.* at 84 (quoting 4 *Corbin on Contracts* § 935, at 761 (1951)). "If however the agreement's terms leave no room for doubt, the decision should be made as a matter of law." *Id.* (quoting *McKenna v. Austin*, 134 F.2d 659, 664 (D.C.Cir.1943)). The Utah court explained:

> *When the claim of the obligee is liquidated in amount, and the payment made on that claim by one obligor is in money, it should not be difficult to determine if the parties intended the payment to be in full satisfaction of the claim or not.* However, when either the claim is unliquidated or the payment is made in something other than money, the question is more complex.

*Western Steel Co.*, 663 P.2d at 84 (emphasis added).

■ We likewise conclude that under HRS § 483–3 (UJOA § 3), when an obligee has received full satisfaction of a debt from a co-obligor, all other co-obligors are discharged, even if the obligee did not intend to release the other co-obligors. Stated another way, once an obligee has received full compensation for a debt from a co-obligor, the intention of the obligee in releasing another co-obligor becomes irrelevant, since HUJOA § 3 prevents double recovery by the obligee.

In the instant case, Reed and James were jointly and severally liable under the AOS to pay Converse a total debt of $75,000. When

Converse exercised his option under the PAO with James, this debt was satisfied in full. Therefore, Converse was precluded from seeking an additional recovery from Reed.

c.

Based on the facts adduced at trial, moreover, we believe that it would defy logic and be patently unjust to accept Converse's position that he was entitled to recover $75,000 from James and another $37,500 from Reed to satisfy James and Reed's joint and several obligation to pay Converse $75,000.

Converse testified at trial that at the time the PAO was executed, the subject property was valued at between $200,000 and $230,000. Additionally, a November 28, 1980 appraisal valued the subject property at $235,000. The parties do not dispute that due to the appreciation in the value of the subject property, James's one-half interest in the subject property was about $117,500 at the time the PAO was entered into. In other words, in consideration for loaning James $25,000 and agreeing to waive James's payment of the loan amount plus the $75,000 balance due under the AOS, a total value of $100,000, Converse received collateral from James valued at $117,500.

Common sense tells us that James would not have agreed to transfer to Converse an interest in real property worth $117,500 in exchange for a discharge from liability only to the extent of his pro rata share of the AOS balance ($37,500), plus the loan amount of $25,000, a total of $62,500. Such a discharge would have been worth just over half the value of James's interest in the subject property, a lopsided exchange. In addition, because James and Reed's liability under the AOS was joint and several, James would still remain liable for Reed's pro rata share of the AOS in the event Reed defaulted, for as the *Restatement (Second) of Contracts* § 289(1) (1981) (*Restatement*) explains, "[w]here two or more parties to a contract promise the same performance to the same promisee, each is bound for the *full performance* thereof, whether his duty is joint, several, or joint and several." (Emphasis added.)

d.

The PAO did not include an express reservation by Converse of a right to proceed against Reed as a joint obligor under the AOS.

According to the *Restatement* § 294 comment e,

[the UJOA] provides explicitly in § 4 that release of one co-obligor does not discharge others if there is an express reservation of the obligee's rights. In the absence of a reservation of rights, § 5 provides that an obligee's claim is satisfied to the extent that he knows that a released obligor paid less than he was bound to pay by his contract or relation with the co-obligor, or in the absence of such knowledge to the lesser extent of the fractional share of the released obligor.

In jurisdictions where the UJOA has been adopted,

a release which does not contain an express reservation of rights against a co-obligor will discharge the co-obligor to the extent of either the amount of the fractional share of the released obligor, or the amount that such obligor was bound by his contract or relation with the co-obligor to pay.

66 Am.Jur.2d *Release* § 36, at 715 (1973). As explained by one commentator:

The provision of [section 4 of the UJOA[4]], that a discharge of less than all the co-obligors with a reservation of rights against the others shall not discharge the latter, is a re-enactment of the common law. But [the second part of section 4 of the UJOA], pertaining to the release of less than all the co-obligors without a reservation of rights against the others, *does alter the law.* It extends the common law rule of suretyship, that a release of a co-surety releases the other joint or joint and several sureties to the extent that the right of subrogation is impaired, to cases of joint debtors. It provides that when an obligee knows or has reason to know that a co-obligor is bound to pay a certain share of

---

4. UJOA § 4 is codified in Hawai'i by HRS § 483–4.

the joint debt on account of his contract with or relation to the other co-obligors, a release of that co-obligor shall be a release of all to the extent of his contract or relational share of the debt, regardless of how small the consideration he pays for his release. In a case of joint debtors, each is, of course, surety for the amount of the debt over and above his own share. But, previously, if a creditor released one for less than his share, he could recover the entire balance of the debt from those not released, regardless of his knowledge of the contract or relation between the co-debtors. This meant that those not released had to resort to their right of contribution to compel the released debtor to pay his full share.

Note, *Uniform Joint Obligations Act: Effect on Existing Law,* 13 Cornell L.Q. 640, 642 (1928) (emphasis added, footnotes omitted).

However,

if [the obligee] does not know of [the contract or relation between the co-obligors], [section 5 [5] of the UJOA] provides that the release shall discharge the obligation of all to the extent of the lesser of two amounts, *viz.,* the released obligor's fractional share of the debt, or his contract or relational share. This gives the obligee the benefit of the contract or relation between the obligors when the released obligor's contract or relational share is less than his fractional share of the debt.

*Id.* (emphasis in original, footnotes omitted).

In Hawai'i, the effect of a release of a co-obligor on a debt without a reservation of rights against other co-obligors is set forth in HRS § 483–5. Other courts that have construed the UJOA provision that parallels HRS § 483–5 have held that the failure of an obligee to reserve rights against remaining co-obligors when executing a release against a co-obligor operates to discharge the non-released co-obligors from liability to the obligee. *See, e.g., Sims v. Western Steel Co.,* 551

F.2d 811, 818 (10th Cir.), *cert. denied,* 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977) (applying Utah law); *Melo v. National Fuse and Powder Co.,* 267 F.Supp. 611, 613 (D.Colo.1967) (applying Utah law); *Greenhalch v. Shell Oil Co.,* 78 F.2d 942 (10th Cir.1935) (applying Utah law).

In *Sims,* a patent infringement case against two parties, the court held that the release of the direct infringer by the plaintiff also operated to release the other defendant accused of inducing the infringement because the release did not contain any reservation of right as to the other defendant. 551 F.2d at 818–19. The court reasoned that

[a]n important aspect of [the UJOA] is to require that there be a reservation of right as to a joint obligor if the person releasing the principal is to retain rights against the joint obligor. Thus, this statute relieves the harshness of the old common law rule.

*Id.* at 818.

In *Melo,* the district court ruled that there had been a release of a joint obligor *"without reserving any rights,"* and thus plaintiff-obligee's action against the other joint obligor was barred. 267 F.Supp. at 613–14 (emphasis in original). The court explained:

It is clear, however, that even under the [UJOA], the release of one joint obligor will still release all *"unless* it contains a reservation of right to the contrary."

*Id.* (quoting Annotation, *Release of One Joint Tortfeasor as Discharging Liability of Others: Modern Trends,* 73 A.L.R.2d 403, 408 (1960) (emphasis in original)).

In the instant case, Converse did not reserve his rights against Reed in the PAO. Therefore, under a plain reading of HRS § 483–4, Reed's liability under the AOS was discharged only to the extent provided in HRS § 483–5. Thus, HRS § 483–5, which deals with the effect of an obligee's knowledge or lack of knowledge of the released obligor's share of liability in relation to co-obligors, governs Reed's liability.[6]

---

**5.** UJOA § 5 is codified in Hawai'i by HRS § 483–5.

**6.** In *American Security Bank v. Nishihara,* the only Hawai'i appellate case that appears to have interpreted HRS § 483–5, this court stated:

We construe an HRS § 483–5 "release" or "discharge" to mean a voluntary and knowing release or discharge of an obligor by an obligee. *See* 76 C.J.S. *Release* §§ 9, 24 (1952 & Supp.1982). Otherwise, the requirement of an

In *Greenhalch,* one of the few cases which has attempted to interpret the complicated language of UJOA §§ 3, 4, and 5, as adopted by the Utah legislature and which correspond directly to HRS §§ 483–3, 4, and 5, respectively, the 10th Circuit Court of Appeals stated:

> In detail, the language of parts of the statute is confusing. In its broad aspect, we have no doubt the legislature intended to embody therein the more liberal rule to which we subscribe, that is, it permits a plaintiff who has not been fully compensated to release one of several defendants without releasing the others by expressly and in writing reserving his rights against such others, with the incidental provision that payments received from the released one shall be credited to the others, unless there exists between the obligors some relationship which would make such credit inequitable.

78 F.2d at 944–45. According to the 10th Circuit, pursuant to UJOA § 3, "no cause of action remains if full compensation for the injury is received [by the obligee.]" *Id.* at 945. As for the first part of UJOA § 4, the 10th Circuit explained:

> [that section] enables a plaintiff to release one obligor without discharging others where there is a written and express reservation of rights against the others. This part of the sentence is clear; there being no such reservation here against defendant, it does not advance plaintiff's case.

The part of [UJOA § 4] after the semicolon provides that without such reservation, the release shall discharge co[-]obligors only to the extent provided in [UJOA § 5]. [UJOA § 5] however is meaningless as applied to cases such as this, where there is no relationship between joint tort-

"express reservation of rights against a co-obligor" is meaningless.
3 Haw.App. 594, 598, 656 P.2d 1347, 1350, *reconsideration denied,* 3 Haw.App. 682 (1983). It is clear, upon examination of the relevant and unambiguous language of the PAO, that this standard was met with respect to the release of James by Converse.

7. *Restatement (Second) of Contracts* § 294 comment e (1981) reads in relevant part:

feasors which requires one of them to pay or contribute to the other.

*Id.* Therefore, the court held, "[UJOA § 5[7]] has no application to this case." *Id.*

In the instant case, the record does not indicate that there was a relationship between James and Reed as joint debtors which required one of them to pay, indemnify, or contribute to the other in the event one of them paid more than his pro rata share of the debt under the AOS. Unlike the Uniform Contribution Among Tortfeasors Act (UCATA), HRS § 663–12 (1985), which created a statutory right of contribution among joint tortfeasors which previously did not exist at common law, *Campo v. Taboada,* 68 Haw. 505, 507, 720 P.2d 181, 183 (1986), the HUJOA does not create a right of contribution among joint obligors. Accordingly, HRS § 483–5 does not apply here. Therefore, there being no reservation of right by Converse against Reed expressed in the PAO, as required by HRS § 483–4, the PAO which discharged James from liability for the balance due under the AOS discharged Reed as well.

Even if there were a right of indemnification between Reed and James for purposes of HRS § 483–5, Converse still received full satisfaction of the AOS from James. Therefore, Reed's liability at least to Converse was discharged under HRS § 483–3.

**e.**

Finally, the Hawai'i Supreme Court's construction of HRS § 663–14 (1985) of the Uniform Contribution Among Tortfeasors Act (UCATA), which governs the effect of a release by an injured party of a joint tortfeasor on the remaining tortfeasors and is very similar in nature to the HUJOA, provides additional support for our conclusion that

> In the absence of a reservation of rights, [UJOA] § 5 provides that an obligee's claim is satisfied to the extent that he knows that a released obligor paid less than he was bound to pay by his contract or relation with the co-obligor, or in the absence of such knowledge to the lesser extent of the fractional share of the released obligor.

Converse's release of James's liability under the AOS discharged Reed's liability as well.

In *Nobriga v. Raybestos–Manhattan, Inc.,* 67 Haw. 157, 162–63, 683 P.2d 389, 393, *reconsideration denied,* 67 Haw. 683, 744 P.2d 779 (1984), the Hawai'i Supreme Court interpreted the UCATA as follows:

> At common law, the release of one joint tortfeasor for any amount released all tortfeasors. To ameliorate this harsh rule and to encourage settlements, the [UCATA] was promulgated and was adopted by Hawaii [Hawai'i] as §§ 663–11 through –17, HRS. It provides that the release of one joint tortfeasor, rather than wiping out the injured party's claim against other joint tortfeasors, merely reduces that claim by the amount paid for the release or the pro rata share of liability of the releasee, whichever is greater.

*Id.; see Ginoza v. Takai, d/b/a Takai Electric Co.,* 40 Haw. 691, 720 (1955) (intent of the framers of the UCATA was to abolish the technical and unfair common law rules governing releases). Thus, the UCATA, like the UJOA, also prevents double recovery by the obligee.

### B. *Whether the Circuit Court Erred in Canceling the AOS*

█ In his third, fourth, and fifth points of error, Reed claims that the circuit court reversibly erred in canceling the AOS because: (1) the cancellation allowed Converse a double recovery; (2) substantial evidence of gross negligence or bad faith by Reed was absent; (3) the cancellation was contrary to the terms of the AOS, which demanded foreclosure. We agree.

█ First, we note that equity abhors forfeitures. *Jenkins v. Wise,* 58 Haw. 592, 597, 574 P.2d 1337, 1341 (1978). As it stands, the result of the circuit court cancellation of the AOS was to award Converse $117,500 (James's one-half interest in the subject property) in addition to Reed's one-half interest (same appraisal value). In addition, the court awarded Converse $6,824.80 in back rent damages from Reed (back rent) and allowed Converse to keep the $5,000 down payment that had been made under the AOS. Thus, under the circuit court's ruling, Converse received a recovery well beyond the benefit of his bargain. As noted earlier, "an obligee is entitled to only one performance or satisfaction, not to double satisfaction even as to any small part." 4 *Corbin* § 936, at 766. Accordingly, we conclude that Reed was entitled to retain his one-half interest in the subject property and the circuit court erred when it ordered cancellation of the AOS.

Second, as this court stated in *PR Pension Fund:*

> [W]here the vendee's breach has not been due to gross negligence, or to deliberate or bad-faith conduct on his part, and the vendor can reasonably and adequately be compensated for his injury, courts in equity will generally grant relief against forfeiture and decree specific performance of the agreement.

8 Haw.App. at 487, 809 P.2d at 1144 (quoting *Jenkins,* 58 Haw. at 597, 574 P.2d at 1341). Furthermore,

> [w]here a purchaser seeks specific performance of a land purchase contract, the general rule provides that he must show that (1) he paid the purchase price or tendered it to the seller or (2) he has a good excuse for his failure to do so pay or tender and has the readiness, willingness, and ability to pay.

*Id.* at 488–89, 809 P.2d at 1144–45 (citing 71 Am.Jur.2d *Specific Performance* § 65 (1973)).

In the instant case, Reed maintains that he failed to pay Converse $37,500 under the AOS "because he did not feel that was his obligation." In addition, the record reveals that after James defaulted under the PAO in November of 1980, Converse did not make any demands of Reed for payment under the AOS until December of 1981. The record also shows that after Converse exercised his option under the PAO, Reed collected and shared the rent from the subject property with Converse. Later, Reed relied on *Damon,* in which this court vacated the Land Court's judgment against James and Reed and suggested that if the PAO were an option agreement, Reed may be absolved of liability. 5 Haw.App. at 313–14, 689 P.2d at 210. In light of the foregoing circumstances

and our conclusion that Converse received full satisfaction under the AOS, we cannot conclude that Reed's failure to pay the AOS was grossly negligent or in bad faith or that Converse was not reasonably compensated.[8]

### C. Attorney Fees and Costs

Reed also challenges the circuit court's award of attorney fees and costs to Converse, claiming that Converse was not the prevailing party and had no interest in the subject property. In light of our reversal of the judgment of the circuit court, we reverse the award.

### CONCLUSION

Based on the foregoing discussion, we reverse the circuit court's (1) May 7, 1992 Order Denying Motion to Amend Findings of Fact, Conclusions of Law and Judgment Filed on October 15, 1991; (2) May 12, 1992 Order Granting Plaintiffs' Motion for Award of Attorneys' Fees; and (3) Amended Judgment filed on May 27, 1992.

Because the issue was not presented, we do not decide the issue of whether Reed may be liable to James for satisfying Reed's and James's joint and several obligation to pay Converse $75,000.

---

8. Converse's contention that Reed was not "ready, willing and able" to pay the AOS as required by *PR Pension Fund, supra,* is inapposite, given our conclusion that Converse received full compensation for the agreement of sale from James.